**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **NO. CR 06-2403 RB** |
| | ) | |
| **PAUL OTHELLO SMALLS,** | ) | |
| **GLENN DELL COOK,** | ) | |
| **a/k/a "Deuce," and** | ) | |
| **WALTER MELGAR-DIAZ** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court following a June 4, 2007 show cause hearing.  The hearing was precipitated by the Government's Notice of Intent Not to Seek the Death Penalty (Doc. 93), filed May 9, 2007.  Defendants - in individual, sealed ex parte presentations to the Court - addressed whether, in light of the Government's Notice, the: (1) appointment of two counsel, per defendant, should be discontinued; (2) compensation rate for appointed counsel should be reduced to the "non-capital" hourly Criminal Justice Act rate; and (3) use of mitigation experts should be discontinued.  (Notice of Hearing [Doc. 100] 1.)  Having considered the submissions, arguments of counsel, and being otherwise fully advised, I rule as follows.

## I.    Background.

This case stems from the December 30, 2004 death of Philip Thomas Gantz, a federal inmate. Gantz was incarcerated at Doña Ana County Detention Center ("DACDC") on that date.  On November 16, 2006, a federal grand jury indicted Defendants (Paul Othello Smalls, Glenn Dell Cook,

and Walter Melgar-Diaz) in connection with Gantz's death.  The five-count Indictment charges each

defendant with: (1) Conspiracy to Retaliate Against a Witness, Victim or an Informant; (2) Retaliating

Against a Witness, Victim or an Informant; (3) Conspiracy to Tamper with a Witness, Victim or an

Informant; (4) Tampering with a Witness, Victim or an Informant; and (5) Killing a Person Aiding

a Federal Investigation.  This matter is designated a "Complex Case" pursuant to 18 U.S.C. §

3161(h)(8)(A), (B)(ii).  (Order [Doc. 30] 1.)

Gantz was housed in a four-person cell inside a DACDC medical unit when he died.  (*Id.* 2.)

According to the Government, when authorities discovered Gantz's body, "[D]efendants were the

only people in the locked cell."  (Govt.'s Resp. to Def. Smalls' Mot. for Bill of Particulars [Doc. 62]

1.)  The Indictment avers that Defendants conspired to kill Gantz "because he was a 'snitch.'"

(Indictment [Doc. 1] 2.)  Prior to his untimely death, Gantz allegedly cooperated with federal

authorities investigating narcotics trafficking in the Roswell, New Mexico area.

Count 5 alleges that Defendants "intentionally kill[ed] Philip Thomas Gantz, who was

assisting a federal criminal investigation, while that assistance was being rendered and because of it."

(*Id.* 4.)  Therein, it charges Defendants with violating 18 U.S.C. § 1121(a)(2), a death-penalty eligible

offense.  *See* 18 U.S.C. § 1121(a)(2) (2000) ("Whoever intentionally kills . . . any person assisting

a Federal criminal investigation, while that assistance is being rendered and because of it, shall be

sentenced according to the terms of section 1111, including by sentence of death or by imprisonment

for life.").

## II.    Procedural Posture.

Because they were "indicted for . . . [a] capital crime," this Court granted Defendants'

requests that they be appointed two attorneys each.  *See* 18 U.S.C. § 3005; *In re Sterling-Suarez*, 306

2

F.3d 1170, 1171 (1st Cir. 2002) (18 U.S.C. § 3005 requires, upon defendant's request, district court to appoint two counsel "promptly after indictment").  Each defense team is comprised of: (1) lead counsel; and (2) "learned counsel."  *See* 18 U.S.C. § 3005 ("[A]t lease 1 shall be learned in the law applicable to capital cases.").  Defense counsel were appointed at the Criminal Justice Act ("CJA") capital-case hourly compensation rate.  *See* Administrative Office of the Courts, *Guide to Judiciary Policies and Procedures*, v. 7, § 6.02.A.1.a; 18 U.S.C. § 3006A(d).  Funds for mitigation experts were approved.  18 U.S.C. § 3592(a).

Defendant Smalls is represented by lead counsel Howard Anderson and learned counsel Jerry Herrera.  Defendant Cook is represented by lead counsel David Kimmelman and learned counsel Peter Schoenburg.  Defendant Melgar-Diaz is represented by lead counsel Cesar Pierce-Varela and learned counsel Brian Pori.

On May 9, 2007, as noted above, the Government filed formal notice that - as per the U.S. Attorney General's Capital Case Review Committee - it will not seek the death penalty as to any of the Defendants.  (*See* Govt's Notice  [Doc. 93] 1.)

## III.   Discussion.

### A.   Number of Appointed Counsel: Defendants are not statutorily entitled to two court-appointed counsel.

"The right to appointment of two attorneys in federal capital cases is a well established one." *United States v. Waggoner*, 339 F.3d 915, 917 (9th Cir. 2003) ("Congress first created such a right in 1790").  Today, it is codified at 18 U.S.C. § 3005:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . . In assigning counsel under this section, the court shall consider the recommendation of the Federal

3

Public Defender organization . . . .

18 U.S.C. § 3005. Section 3005 does not define "capital crime." As such, the statute does not

expressly address the issue presented here: whether, regardless of the Government's formal notice

that it will not seek the death penalty, Defendants are entitled to retain two appointed counsel.

### 1.        The majority and minority views.

The Courts of Appeal espouse two divergent views of § 3005 in this regard. *United States*

*v. Fields*, No. 04-50393, 2007 WL 926864, at * 24 (5th Cir. Mar. 29, 2007) (recognizing circuit

split). The Court of Appeals for the Tenth Circuit has not, however, squarely addressed the issue.

*Cf. Crum v. Hunter*, 151 F.2d 359, 360-61 (10th Cir. 1945) (interpreting 18 U.S.C. § 563,

predecessor to § 3005) (holding that defendant facing death penalty, who did not request a second

attorney, consequently, had "no statutory right to more than one counsel").

The majority view is that, once the government declines to seek the death penalty in an eligible

case, the matter ceases to be a "capital case" for § 3005 purposes. According to this logic, because

the defendant is "'no longer [a] capital defendant[],'" § 3005's two-attorney requirement is

inapplicable. *Waggoner*, 339 F.3d at 918 (quoting *United States v. Casseus*, 282 F.3d 253, 256 &

n.1 (3d Cir. 2002) (undertaking harmless error review and determining failure to appoint second

counsel under § 3005 is harmless where the government does not seek the death penalty)).

In *United States v. Waggoner*, the Court of Appeals for the Ninth Circuit underscored that

the purpose of § 3005's two-attorney requirement is "derived from the severity of *punishment* rather

than the nature of the offense." *Id.* at 918 (emphasis added) (internal quotation marks and citation

omitted). The *Waggoner* court reasoned that:

> Section 3005 requires that the defendant be provided two attorneys when he
> is indicted for a "capital crime." Just as all murder does not constitute the crime of

4

> capital murder, the term "capital crime" as used in § 3005 does not encompass the
> underlying offense when capital punishment cannot be imposed . . . .
>
> . . . when a defendant is no longer subject to "indictment" for a "capital crime"
> because the threat that the death penalty will be imposed has been eliminated, the
> defendant no longer has a statutory right to a second court-appointed attorney to
> defend him at the trial of the non-capital offense.

*Id.* at 918 (citations omitted) (quoting 18 U.S.C. § 3005); *see also id.* at 917 ("This conclusion is

compelled by *United States v. Dufur*, 648 F.2d 512 (9th Cir. 1980), in which we held that the

invalidation of the death penalty provision of 18 U.S.C. § 1111 in *Furman v. Georgia*[, 408 U.S. 238

(1972)] . . . eliminated a defendant's right under § 3005 to a second attorney in a capital

prosecution"). *Accord United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998) (holding that

defendant was "properly denied benefits afforded to a capital defendant because the Government

stipulated that it would not seek the death penalty and thereby transformed this case into a non-capital

proceeding"); *United States v. Shepherd*, 576 F.2d 719, 729 (7th Cir. 1978) (pre-1994 amendment)

(same); *United States v. Weddell*, 567 F.2d 767, 770-71 (8th Cir. 1977) (pre-1994 amendment)

(same); *see also See United States v. Rodriguez-Berrios*, 385 F. Supp. 2d 134, 136 (D.P.R. 2005)

(recognizing that the "majority of the Circuits" have held that § 3005 only entitles a defendant to two

counsel "while he is exposed to the death penalty.").

     The Court of Appeals for the Fourth Circuit is the only appellate court to conclude that §

3005 "provides an absolute statutory right to two [court-appointed] attorneys in cases where the

death penalty may be imposed." *United States v. Boone*, 245 F.3d 352, 358 (4th Cir. 2001) (2-1

decision). In *United States v. Boone*, the Fourth Circuit employed a plain-language reading of §

3005:

> The statute begins with the phrase "Whoever is *indicted* for . . . *capital crime* . . ."
> This language provides the statutory trigger for the section, and the text is clear that

the statute becomes applicable upon indictment for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty.

*Id.* The *Boone* court found it significant that, although Congress amended other portions of § 3005 in 1994, the "triggering language" for the two-attorney requirement is "identical" in the "pre- and post-1994 versions" of § 3005. *Id.* at 360. The Fourth Circuit, adhering to *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973), reasoned that:

> If Congress wished to limit the two-attorney requirement to cases in which the death penalty is actually sought, it could easily have done so [when it amended § 3005 in 1994]. We decline to read into the statute a requirement that is not readily apparent. . . .
> Until . . . Congress rewrites § 3005 mandating that it apply only in cases where the death penalty is actually sought by the government, we will not ignore the plain language of the section with its statutory trigger that § 3005 applies upon indictment for a capital crime. As we observed in *Watson* in 1973, "Section 3005 is unequivocal in its terms. We have no right to rewrite it . . . ."[1]

*Id.* at 360-61 (quoting *Watson*, 496 F.2d at 1126-27) (2-1 decision) (additional citations omitted). *Contra id.* at 366 (Kiser, J., dissenting) ("I believe that *Watson* was wrongly decided. I agree with [the *Watson* dissent] that it is the finality of the punishment, not the complexity of the offense, that undergirds the two-attorney requirement of § 3005."); *Watson*, 496 F.2d at 1130 (Murray, J., dissenting) (same).

### 2.      Tenth Circuit case law.

As noted above, the Tenth Circuit has not squarely addressed the instant issue. Two Court of Appeals decisions are, nevertheless, informative.

In *United States v. Maestas*, 523 F.2d 316 (10th Cir. 1975), the Tenth Circuit rejected the defendant's claim that, "having been indicted for a crime punishable by death," he "was denied his

---

[1]Presumably because it found § 3005's plain-language meaning unambiguous, the *Boone* court did not consider Congress's purpose in enacting the provision. *See Boone*, 245 F.3d at 360-61.

right to the requisite number of peremptory jury challenges afforded under [Fed. R. Crim. P. ] 24(b)."
*Id.* at 318.  At the time of the *Maestas* defendant's trial, Fed. R. Crim. P. 24(b) provided that: "If the
offense charged is punishable by death, each side is entitled to 20 peremptory challenges. If the
offense charged is punishable by imprisonment for more than one year, the government is entitled to
6 peremptory challenges and the defendant . . . to 10 peremptory challenges."[2]  *Id.* at 318 n.2.  The
court held that, because the death penalty was not sought, the case "*lost its capital nature* as charged
in the indictment" and, hence, the trial court did not err in declining to afford the defendant a
procedural right reserved for capital defendants.  *Id.* at 318-19 (emphasis added).

In *United States v. McCullah*, 76 F.3d 1087, 1098 (1996), the Tenth Circuit considered §
3005's "learned in the law" requirement as it existed prior to 1994.  The *McCullah* court explained
that, as § 3005 "existed at the time of Mr. McCullah's trial, a capital defendant [wa]s entitled to
'counsel learned in the law.'"  *Id.* (quoting 18 U.S.C. § 3005 (1982)).  In 1994, however, Congress
amended that portion of § 3005 to provide that: "at least 1 [of the two counsel appointed for a
defendant charged with a "capital crime"] shall be learned in the law *applicable to capital cases*."
*See id.*; 18 U.S.C. § 3005 (2000).

In finding that the defendant was "properly represented by counsel 'learned in the law' under
the former Section 3005," the Tenth Circuit analyzed § 3005 this way:

> The plain meaning of the phrase "learned in the law" refers to a person who has
> received a regular legal education, generally signified by admission to the bar.  The
> plain meaning of the phrase does not imply any specialized death penalty experience.
> *If Congress intended that counsel be learned in the law applicable to capital cases,*
> *it could have so stated, which it did when it amended the statute in 1994.*  Despite

---

[2]Today, Rule 24(b)(1)'s applicability to cases in which the death penalty is a possible penalty is even
clearer: "(1) Capital Case. Each side has 20 peremptory challenges when the government seeks the death penalty."
Fed. R. Crim. P. 24(b)(1).

Mr. McCullah's contention to the contrary, the 1994 amendment did not merely "clarify" the law but rather substantively changed it, creating a new requirement which previously had not existed.

*Id*. (emphasis added) (citations omitted).

> **3.    Section 3005 does not entitle Defendants to two court-appointed attorneys.**

Defendants are no longer entitled to two court-appointed attorneys each.  Section 3005 does not define "capital crime"; the language is ambiguous as illustrated by the majority and minority interpretations of the provision.  As such, the statute's purpose is critical to § 3005's meaning. *Maestas*, 523 F.2d at 318.  This Court agrees with the Third, Seventh, Eighth, Ninth, and Eleventh Circuits that § 3005's purpose is "derived from the severity of punishment rather than the nature of the offense." *Waggoner*, 339 F.3d at 918 (internal quotation marks and citations omitted).  Tenth Circuit precedent, a commonsense reading of the provision, as well as Congress's 1994 amendments, inform the Court's conclusion on this point.  Hence, given that § 3005 was enacted to afford defendants who face being put to death with additional resources in preparing their defense, "this case lost its capital nature as charged in the indictment" when the Government filed its Notice. *See Maestas*, 523 F.2d at 318.

First, this outcome is mandated by the Tenth Circuit's finding in *Maestas* that a "case los[es] its capital nature as charged in the indictment" and, as such, a defendant is no longer entitled to benefits reserved for defendants in "capital cases." *Id*. *Maestas*'s interpretation of Rule 24(b)(1), as with this Court's reading of § 3005's, is derived from that provision's purpose.  Like § 3005, Rule 24(b)(1) is tied to the punishment facing a defendant, without regard to Defendant's underlying offense. *Waggoner*, 339 F.3d at 918 ("the term 'capital crime' as used in § 3005 does not encompass the *underlying offense* when capital punishment cannot be imposed" (emphasis added)).

8

Second, the fact Congress amended § 3005 to require "learned counsel" to be "learned in the law *applicable to capital cases*" in 1994 is significant.  As the *Boone* dissent reasoned:

> The requirement that counsel be "learned in the law applicable to capital cases" clearly refers to the simultaneously-enacted sentencing and appeal provisions of the Federal Death Penalty Act. *See* 18 U.S.C. § 3592 (identifying aggravating and mitigating factors to be considered in determining whether sentence of death is justified); 18 U.S.C. § 3593 (specifying that the prosecutor must give notice of intent to seek death penalty and outlining the unique post-conviction procedure for sentencing in a capital case); 18 U.S.C. § 3595 (providing procedures for appeal of sentence of death). In a given case, these provisions come into play only *after* the government has decided to pursue the death penalty and apprised the court of its intention to do so.[3]

*Boone*, 245 F.3d at 364-68 (Kiser, J., dissenting).

It is also significant that Congress's 1994 amendments did *not change* § 3005 two-attorney requirement in any regard.  As the Tenth Circuit recently explained:

> Whether Congress has acquiesced in the [prevailing] judicial interpretations of [a statute at the time it amended that provision] . . . is a difficult and close question. Congressional silence alone is not enough to prove acquiescence.  *Silence as to one area, however, coupled with a myriad of revisions within the same statutory scheme begins to look like acquiescence.*

*High Country Citizens Alliance v. Clarke*, 454 F.3d 1177, 1190 (10th Cir. 20006) (emphasis added) (citing *Cent. Bank of Denver v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 185 (1994), and *Johnson v. Transp. Agency, Santa Clara County*, 480 U.S. 616, 629 n.7 (1987) ("Congress has not amended the statute to reject our construction, nor have any such amendments even been proposed, and we therefore may assume that our interpretation was correct.")) (additional citations omitted).

---

[3] While sparse, the legislative history that exists regarding the 1994 amendments to § 3005 indicates Congress was focused on the death penalty itself, rather than the nature of any eligible substantive offense.  *See* 140 Cong. Rec. S12314-01 - S12369-01 (1994) (only discussion of amendment related to concern for the fact that defendants with appointed, as opposed to retained, counsel, receiving the death penalty at much higher rates); *see, e.g., id.* at S12325-01 (statement of Sen. Simon) ("What is clear as you look at the death penalty is, if you have enough money and can get the finest attorneys, you will never receive the death penalty. The death penalty is a penalty we reserve for people of limited means.").

At the time Congress amended § 3005 in 1994, all the circuits that had addressed the issue - save the Fourth Circuit - concluded that the two-attorney requirement was inapplicable once death was no longer a possible sentence. *Accord United States v. Freeman*, No. S402CR150LAP, 2005 WL 397932, at *2 (S.D.N.Y. Feb. 17, 2005) ("If any legislative intent can be drawn from Congress' 1994 amendment, it is that the amendment [i.e., Congress's election not to alter the two-attorney requirement language] should be taken to embody the then-prevailing view in the courts [i.e., that a case ceases to be a "capital case" once the death penalty is not a potential penalty].").

As such, the Court's understanding of § 3005 is wholly consistent with the Tenth Circuit's *McCullah* holding. *See McCullah*, 76 F.3d at 1098 (post-1994 version of § 3005 creates a new substantive requirement that learned counsel appointed under § 3005 "have prior capital punishment experience"). Put simply, *McCullah*"s interpretation provides further evidence that Congress's purpose in enacting § 3005 is tied to the severity - i.e., the nature - of capital punishment.[4]

Third, in any event, *Boone* - like *Watson*, upon which it relied - is "an outlier case" even "*within* the Fourth Circuit." *See Boone*, 245 F.3d at 365 (Kiser, J., dissenting) (emphasis added) (noting that *Watson*'s interpretation of § 3005, upon which the *Boone* majority relied, has been "rejected" by "all other courts that have addressed the issue") (collecting cases); *id*. at 368 ("Even in the Fourth Circuit, *Watson* is an aberration. An earlier case, not mentioned by the *Watson* court,

---

[4]True, the *McCullah* court's plain-language analysis of § 3005's "learned in the law" provision is similar to that employed by the Fourth Circuit in *Boone*. Both courts found Congress's 1994 amendments - and, therein, the opportunity to substantively change § 3005 - significant. But, in *McCullah*, the Tenth Circuit found that in *adding* language to § 3005, Congress intended to create "a new requirement." Conversely, *Boone* found that in *not* adding to, or changing, § 3005's language, Congress intended § 3005's applicability to be triggered by "indictment" for a capital-eligible offense alone. This is, of course, significant. As the *Boone* dissent aptly noted, "Congressional silence" is not typically "a reliable guide to statutory interpretation." *Boone*, 245 F.3d at 368 (Kiser, J., dissenting); *see High Country Citizens Alliance*, 454 F.3d at 1190; *see also id*. at 1198 (Briscoe, J., dissenting) (statutory "silence is not determinative").

held that the procedural protections generally afforded capital defendants do *not* apply when there is no chance that the death penalty will be imposed." (emphasis added) (citing *Hall v. United States*, 410 F.2d 653, 660 (4th Cir. 1969)); *but cf. United States v. Williams*, 544 F.2d 1215, 1218 (4th Cir. 1976) (holding that failure to appoint second counsel under section 3005 "gives rise to an irrebuttable presumption of prejudice").  Shortly after *Boone* was decided, its holding was questioned by another Fourth Circuit panel.  *United States v. Robinson*, 275 F.3d 371, 384 (4th Cir. 2001).  In *Robinson*, a different Fourth Circuit panel stated:

> Applying *Boone*--as we must . . . we conclude that Robinson has satisfied the first three prongs of plain error analysis.  While Robinson was provided with two attorneys during pretrial proceedings, one of those attorneys was relieved of his duties after the Government elected not to seek the death penalty against Robinson . . . . [T]he error necessarily affected Robinson's substantial rights. We decline, however, to exercise our discretion to notice the error . . . . the failure to provide a *non-capital* defendant with the benefit of a provision designed to provide additional protection to capital defendants--did not affect the fairness, integrity, or public reputation of judicial proceedings.

*Robinson*, 275 F.3d at 384 (emphasis in original); *see also United States v. West*, 90 F. App'x 683, 692 (4th Cir. 2004) (no reversible error where, "[d]espite the latitude accorded to the District Court by our opinion in *Robinson*, the trial judge in this case appointed a second attorney for the non-capital defendant Jackson to assist lead counsel in the case." (citing *Robinson*, 275 F.3d at 384)).

Nevertheless, Defendant Melgar-Diaz urges this Court to adopt the Fourth Circuit's minority view in light of *United States v. Martinez*, No. CR 02-1055 JB, 2007 WL 709015, at *1 (D.N.M. Feb. 16, 2007).  That case considered the nature of a "capital case" under 18 U.S.C. §§ 1111, 3598. Defendant Melgar-Diaz contends that *Martinez*, is "consistent with" the Fourth Circuit's interpretation of § 3005's two-attorney requirement as evidenced by *Martinez*'s citation to Fourth

11

Circuit authority.[5]  (Def. Melgar-Diaz Resp. 3-4.)  The Court disagrees.

In *Martinez*, the question presented was whether the defendant, accused of first-degree murder, a crime that is generally eligible for the death penalty, was indicted for a "capital offense" given that the United States could not seek the death penalty in his case.[6]  *Id.*  The defendant argued that he was not charged with a capital offense and that the prosecution was time-barred by the five-year applications period applicable "non-capital" offenses.  *Compare* 18 U.S.C. § 3281 ("An indictment for any offense punishable by death may be found at any time without limitation."), *with* 18 U.S.C. § 3282 (imposing five-year limitation period for most non-"capital" offenses).  The *Martinez* court rejected the defendant's arguments, holding that defendant was charged with a "capital offense" for statute of limitations purposes, and, therefore, no limitations period applied and the prosecution was not time-barred.  *Id.* at *11.

Defendant Melgar-Diaz underscores that, in so finding, the *Martinez* court stated that the fact the death penalty was not available in the defendant's case did "not render the offense [he was charged with - i.e., first-degree murder] 'not capital' with respect to other statutes 'predicated in their operative effect upon the concept of a capital crime.'"  *Id.* at *9 (quoting *United States v. Ealy*, 363 F.3d 292, 297 (10th Cir. 2004) (quoting *Watson*, 496 F.2d at 1127) (rejecting applicability of § 3282's five-year statute of limitations period where prosecution did not allege "any statutory

_____

[5]Defendant Melgar-Diaz also states that "Judge Browning implicitly recognized in *Martinez* [that] the difficulty and complexity of defending a 'capital' case remains even if the Government elects not to seek a penalty of death."  (Def. Melgar-Diaz Resp. 4.)  The basis for this claim is wholly unclear: *Martinez* never addressed the "difficulty and complexity" attendant to a capital defense.

[6]Section 3598 provides that, in Indian Country, whether the federal death penalty is an available penalty is determined by each tribe, individually; "a defendant is not subject to a capital sentence, unless the tribe on whose land the offense occurred has elected to have the federal death penalty provisions be operative over its lands."  *Id.* at *2.  Because San Juan Pueblo had not elected to "have the death penalty apply to federal offenses committed within [its] geographic boundaries," the death penalty was not a possible penalty in the defendant's case.  *Id.*

aggravating factors in the indictment" notwithstanding *Furman v. Georgia*)).  This language, considered in context, is wholly consistent with the conclusion reached here.

First, as a general matter, it bears noting that *Martinez* recognized that there is a "difference between a statutorily available sentence and the case-specific sentence [a defendant] potentially faces."  *See Martinez*, 2007 WL 709015, at *8; *accord Maestas*, 523 F.2d at 319 ("case lost its capital nature as charged in the indictment" when death penalty was no longer a possible penalty); *In re Sterling-Suarez*, 306 F.3d at 1175 ("Words used in statutes, after all, are tools and a phrase like "capital case" can mean different things in different contexts.").

Second, *Martinez*'s finding, that the fact the government could not seek the death penalty against defendant pursuant to § 3598, did not mean his case was "not capital" for purposes of the statute of limitations, was tied to those statutes' respective purposes.  *Compare Martinez*, 2007 WL 709015, at *8-*9.  Hence, *Martinez* is readily distinguishable in this regard from this matter: the statutes at issue there and § 3005, at issue here, have very different purposes.  *Compare Martinez*, 2007 WL 709015, at *9 (§ 3598 was enacted to "empower[] the sovereign [Indian] nations"), *id*. at *8 (§ 3281 "reflects Congress' judgment that some crimes are *so serious* that an offender should *always be punished* if caught." (internal quotation marks and citation omitted)), *and id*. at *11 (finding that, but for § 3598's application, § 3281 would apply to defendant's case . . . [and, thus, finding that a five-year limitations applied to defendant] "would undercut the policy of repose that the statutes of limitations were meant to serve and would directly contravene Congress' judgment regarding the seriousness of first-degree murder"), *with supra* at p. 8 (finding that § 3005 was enacted because of the severity of capital punishment and, thus, extending these benefits to cases where the government is not seeking the death penalty would contravene congressional intent).

*Martinez* - like *Ealy* - construed a provision that, in exempting "any offense punishable by death" from a limitation period, was concerned with the *nature* of the indicted offense.  By contrast, Section 3005's purpose is tied to the "severity of the punishment rather than the nature of the offense."  *See Maestas*, 523 F.2d at 319 (interpreting Fed. R. Crim. P. 24(b)(1)).  Indeed, a contrary outcome in *Martinez*, would have meant that an entire class of "underlying *offenses* . . . lost their capital nature."  *Martinez*, 2007 WL 709015, at *10.  That is not the result here.  Finding that § 3005 is inapplicable unless the death penalty is actually sought does *no*t effect the capital-nature of the charged offenses for other purposes.  *Waggoner*, 339 F.3d at 919.

Because the "threat that the death penalty will be imposed has been eliminated," Defendants are no longer "subject to 'indictment' for a 'capital crime'" for § 3005 purposes.  *See Waggoner*, 339 F.3d 919.  As such, § 3005 does not entitle Defendants "to a second court-appointed attorney to defend [them] at the trial of the non-capital offense[s]" they face.  *See id.*; *cf. In re Sterling-Suarez*, 306 F.3d at 1171-72 (noting that, while the issue was not before it, other courts had "declined to provide to the defense . . . advantages peculiar to capital cases unless the death penalty is actually sought").

> ### B.      Number of Appointed Counsel: Court will not exercise its discretion to continue the appointment of two counsel per Defendant.

In any case, notwithstanding the fact Defendants are not *entitled* to two court-appointment counsel, it is within this Court's discretion to order the continued appointment of two counsel.  *See United States v. Steel*, 759 F.2d 706, 710 (9th Cir. 1985); *cf. United States v. Nichols*, 184 F.3d 1169, 1170 (10th Cir. 1999) (three attorneys appointed; death penalty sought) (defendant, and co-defendant Timothy McVeigh, charged in an eleven-count indictment in connection with the bombing of the Murrah Federal Building in Oklahoma City).  Guidance for what circumstances warrant the

continued appointment of two counsel, where the government does not seek the death penalty, is provided by the Administrative Office of the U.S. Courts' *Guide to Judiciary Policies and Procedures*. That resource states that:

> If, following the appointment of counsel in a case in which a defendant was charged with an offense that may be punishable by death, it is determined that the death penalty will not be sought, the court should consider the questions of the number of counsel . . .  needed for the duration of the proceeding.

Admin. Office of the U.S. Courts, Guide to Judiciary Policies & Procedures ("AO Guide"), vol. VII, chap. VI, part B, § 6.02.B.2; *see id.* § 6.02.F.3.c.iii. ("as soon as practicable after a decision not to seek the death penalty, the number of appointed counsel and hourly rate of compensation should be reviewed in accordance with subparagraph 6.02 B(2)").

Notably, it underscores that "absent *extenuating* circumstances," the court should make an "appropriate reduction in the number of counsel." *Id.* § 6.02.B.2 (emphasis added). The Guide outlines four factors that courts should consider in "deciding whether there are extenuating circumstances":

> (a) the need to avoid disruption of the proceedings;
> (b) whether the decision not to seek the death penalty occurred late in the litigation;
> (c) whether the case is unusually complex; and
> (d) any other factors that would interfere with the need to ensure effective representation of the defendant.

*Id.* (emphasis added).

The Court does not find that extenuating circumstances are present here. Continued appointment of two attorneys is, therefore, not warranted.   The four factors outlined by the Guide are taken up in turn, though the first factor is discussed last.

As to the second factor, the Government made its decision not to seek the death penalty relatively *early* in this litigation.  The Government's Notice was filed only six months after the

15

Indictment issued.  In the Court's experience, compared to other death-penalty eligible cases, the Government reached its decision relatively quickly.

As to the third and fourth factors, the Court recognizes this is a complex case.  This is particularly so because the offenses alleged occurred in the penal context, the victim purportedly had an, as yet unknown, number of enemies due to his cooperation with authorities, and the precise cause and manner of the victim's death remain in some question.  By all accounts, the Government's discovery disclosures have been voluminous.

Notwithstanding these complexities, this case is not "*unusually* complex" for a death-penalty eligible case.  Nor are there "other factors" such that the two-court appointed counsel is needed to ensure Defendants receive effective representation.  *Cf.*, *e.g.*, *United States v. Gonzales*, No. CR-95-538-MV, 1997 WL 155403, at *1 (D.N.M. Feb. 11, 1997), *vacated, in part, on other grounds by* 150 F.3d 1246, 1251 (10th Cir. 1998) (two attorneys appointed for each defendant facing the death penalty; one attorney appointed for remaining defendants) (prosecution involving twenty-three defendants indicted for, *inter alia*, murder, attempted murder, drug distribution, and racketeering"); *United States v. Garcia*, No. 01 CR. 1110(GEL), 2004 WL 1794489, at *1 (S.D.N.Y. Aug. 11, 2004)  (ordering continued appointment of two counsel per defendant, even after government announced it would not seek the death penalty) (defendants charged with "various counts of narcotics trafficking and murder in furtherance of an alleged criminal enterprise . . . [which] allegedly occurred over a period of about ten years"); *United States v. Davidson*, No. 92 Cr. 35, 1992 WL 165825, at *4-*6 (N.D.N.Y. July 10, 1992) (same) (noting the complexity of the case given: (1) "multiple prior state court proceedings and their attendant voluminous transcripts"; (2) the defendants' "possibly conflicting positions"; and (3) the complex and challenging nature of the crimes charged, "especially

16

the murder of a law enforcement officer").  In reaching this decision, the Court also underscores its confidence in counsels' abilities.

Turning finally to the first factor, the continued appointment of two counsel per Defendant is not needed to "avoid disruption" of this matter.  Each Defendant's case presents different reasons for this outcome.

### 1.      Defendant Smalls.

At the June 4, 2007 hearing, lead counsel Howard Anderson moved to withdraw as counsel of record regardless of the Court's decision here.[7]  Disruption in Defendant Smalls' representation is, therefore, inevitable.  Any attorney appointed in Attorney Anderson's stead would need to devote considerable time and energy reviewing this case to come up to speed.   Hence, continued appointment of two counsel for Defendant Smalls is not needed to avoid disruption of this case.  The Court is confident that learned counsel Herrera is quite able to effectively represent Defendant Smalls in this matter without co-counsel, especially given the simplified posture effected by the Government's Notice.

### 2.      Defendant Cook.

While Defendant  Cook's counsel stated that two counsel would benefit their client, they did not do so strenuously.  Instead, their presentation to the Court focused on the need for Attorney Schoenburg to remain counsel of record.  Counsel agreed that Schoenburg has done the vast majority of work in this case, to date.  Schoenburg apparently spearheaded the factual investigation - e.g., coordinating with Defendant's investigator and reviewing the 4000 pages of discovery disclosed by

---

[7]For present purposes, it is sufficient to note that Anderson's withdrawal motion was precipitated by events wholly unrelated to the case at bar.

the Government - and the mitigation aspects of Defendant Cook's case.  No doubt this is, in no small part, due to Albuquerque-based Schoenburg's geographic proximity to Defendant Cook, who is presently housed in Albuquerque.  Kimmelman's offices are in El Paso, Texas.

In any event, as a result of his efforts, Schoenburg has developed a close attorney/client relationship with Defendant Cook.  Accordingly, discontinuing Kimmelman's appointment, given his admittedly, relatively, limited investment in the case to date, will not disrupt Defendant Cook's defense.  Schoenburg's ability to manage this case to date gives the Court every confidence that he can ably handle Defendant Smalls' defense alone, particularly given that the death penalty is not sought.

       **3.**      **Defendant Melgar-Diaz.**

Counsel for Defendant Melgar-Diaz argued strongly that the continued appointment of both his attorneys is necessary due to factors unique to Defendant.  Namely, they cited the logistical challenges presented by Defendant being housed in southern New Mexico and the fact that Defendant does not speak English.  The Court respectfully disagrees that either ground warrants the continued appointment of two attorneys.

Defendant Melgar-Diaz is currently housed in southern New Mexico, at the Otero County Detention Center, a facility able to provide Defendant the medical treatment he requires.  Defendant speaks Spanish; he does not speak English.  Attorney Pierce-Varela is the third attorney appointed as Defendant's lead counsel; he became counsel of record on April 17, 2007.  His office is located in Las Cruces, which has enabled him to frequently visit Defendant.  Pierce-Varela speaks Spanish fluently.  Learned counsel Pori has represented Defendant Melgar-Diaz from the outset of this proceeding.  His office is located in Albuquerque, a five-hour drive from Otero County.

As to the language issue, Pori told the Court that his Spanish language skills are far inferior to Pierce-Varela's and that lead counsel's continued appointment was needed to facilitate attorney/client relations.  While the Court knows Pierce-Varela to have excellent Spanish skills, it believes Pori is too modest about his own abilities.  The Court observed Pori converse directly with his client, in Spanish, during the June 4, 2007.  He did so without any hesitation or obvious difficulty.[8] Funds to hire an interpreter will be given close consideration, should that be necessary.

Counsel also argued that the continued appointment of Pierce-Varela was needed to facilitate frequent attorney-client contact.  The Court recognizes that, if Defendant Melgar-Diaz continues to be housed in Otero County, it would make it difficult for Pori to visit him regularly.

The Court spoke with the U.S. Marshal Service about this concern.  Should Pori and Defendant so chose, alternative housing will be made available to Defendant at a northern New Mexico facility.  The Court has confirmed that this alternative placement could address Defendant's unique health needs.  Lastly, the Court, having noted Pori's involvement in this case, is confident that he can effectively represent Defendant Melgar-Diaz without co-counsel, especially in light of the Government's Notice.

Hence, this case does not fall within the "extenuating circumstances" outlined by the AO Guide.  The number of counsel will be reduced to one attorney per Defendant.  For the aforementioned reasons, Attorneys Herrera, Schoenburg, and Pori will remain counsel of record. [9]

---

[8]Pori did not, for instance, seek Pierce-Varela or the Court Interpreter present to assist him in communicating with his client.

[9]The Court notes that it believes its decision is, not only equitable to the parties, but is also the best use of finite public funds apportioned under the CJA.  Additionally, the Court wishes to clarify that, though learned counsel for each Defendant will remain counsel of record here, their "learned counsel" status did not, as noted herein, dictate this outcome.

19

The Court notes that, should it later become "unusually complex" going forward, the Court will

consider the "appointment of additional counsel." *United States v. Howe*, No. 4:05CR000139GH,

2007 WL 687000, at *1-*2 (E.D. Ark. Mar. 2, 2007) (applying AO Guide § 6.02B(2)).

   **C.    Compensation of Appointed Counsel: Appointed counsel will be compensated
          at the CJA capital-case rate.**

        Guidance regarding the appropriate compensation rate - i.e., the capital rate and non-capital

rate - is also found in the Administrative Office of the U.S. Courts' *Guide to Judiciary Policies and*

*Procedures*.  It provides, in applicable part, that:

> If, following the appointment of counsel in a case in which a defendant was charged
> with an offense that may be punishable by death, it is determined that the death
> penalty will not be sought, the court should consider the questions of . . . the rate of
> compensation needed for the duration of the proceeding.

Admin. Office of U.S. Courts, Guide to Judiciary Policies & Procedures ("AO Guide"), vol. VII,

chap. VI, part B, § 6.02.B.2; *see id*. § 6.02.F.3.c.iii. ("as soon as practicable after a decision not to

seek the death penalty, the number of appointed counsel and hourly rate of compensation should be

reviewed in accordance with subparagraph 6.02 B(2)").  Further, the AO Guide advises that:

> the court should, *absent extenuating circumstances*, reduce (only prospectively) the
> compensation rate. In determining whether there are extenuating circumstances, the
> court should consider the following factors:
>
>> (a) the extent to which this representation precludes counsel from taking other
>> work;
>> (b) the commitment of time and resources counsel has made and will
>> continue to make in the case; and
>> (c) the need to compensate appointed counsel fairly.

*Id*.  (emphasis added).

        The Court has given all three factors due consideration.  Most weighty in the Court's

reasoning is the first factor.  This case's complexity and unique challenges, discussed above, are likely

to make it extremely difficult for appointed counsel to maintain a full caseload.  As such, counsel will continue to be compensated at the higher "capital" rate.

**III.     Conclusion.**

For all the foregoing reasons, Defendants are not entitled to two court-appointed attorneys. *Waggoner*, 339 F.3d at 917-919; *see Maestas*, 523 F.2d at 319; *see also McCullah*, 76 F.3d at 1098. Nor is the continued appointment of two counsel warranted, as a matter of judicial discretion.  *See* AO Guide, vol. VII, chap. VI, part B § 6.02.B.2.  Accordingly, Attorneys Howard Anderson, David Kimmelman, and Cesar Pierce-Varela are **relieved** as counsel of record for Defendants Smalls, Cook, and Melgar-Diaz, respectively.   Attorneys Jerry Herrera, Peter Schoenburg, and Brian Pori will **remain** counsel of record.  Due to the significant amount of time and resources this case will require, counsel of record will continue to be appointed at the CJA **capital-case** hourly compensation rate.

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**