**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.                                                                                           No. CR 06-2403 RB

**GLENN DELL COOK and**
**PAUL OTHELLO SMALLS,**

    **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendants' Motion to Dismiss the Indictment Because the Grand Jury Selected in the Case Failed to Represent a Fair Cross-Section of the Community, as Will the Future Petit Jury (Doc. 307), filed on June 19, 2008. The Court held evidentiary hearings on this motion, and a similar motion filed in the case styled *United States v. Larry Lujan*, and numbered CR 05-0924 RB, on September 2, 2008 and September 10, 2008. Having considered the arguments of counsel, evidence and official court records, relevant law, and being otherwise fully informed, I deny Defendants' motion.

**I.    Summary of Arguments.**

Defendants contend that it has long been apparent in New Mexico that any jury selection system which selects potential jurors only from registered voters, rather than a more inclusive method, systematically excludes a sizeable number of eligible Hispanics, young people and men in violation of the Sixth Amendment, the Equal Protection Clause of the Fifth Amendment and the Jury Selection and Service Act, 28 U.S.C. §§ 1861-1869 (herein "JSSA").

Specifically, Defendants argue that: (1) the jury selection system in the District of New Mexico systematically under-represents Hispanics; (2) the jury selection system in the District of

New Mexico systematically under-represents young adults aged 18-34; (3) the jury selection system in the District of New Mexico systematically under-represents men; (4) the consistent, historical under-representation of Hispanics and other groups in New Mexico is sufficiently egregious as to warrant dismissal in this case and a practical, inexpensive solution, envisioned by the Federal Judicial Center, is available by way of supplementing the jury pool with citizens who hold a driver's license, a process currently engaged in by the New Mexico state court system and thirty-two federal districts.

The Government argues that: (1) the proper comparisons involve the relevant qualified jury wheels; (2) persons ages 18-34 are not a legally distinctive group; (3) men have not been identified as a legally distinctive group; (4) Defendants failed to show that the representation of Hispanics, young persons ages 18-34, and men is not fair and reasonable in relation to the numbers of such persons in the community; and (5) Defendants have failed to show that such persons have been systematically excluded. The Government maintains that alternative jury plan formats are, therefore, irrelevant.

## II.     Factual Background.

The District of New Mexico has adopted written plans for jury selection. The current plan was adopted by order, filed on December 12, 2006 (the "2006 Jury Plan"). (Pl. Ex. 1-A.) The 2006 Jury Plan replaced the plan adopted by order, filed on January 25, 2005 (the "2005 Jury Plan"). (Pl. Ex. 1-B.) The 2005 Jury Plan replaced the plan adopted by order, filed on December 1, 2003 (the "2003 Jury Plan"). (Pl. Ex. 1-C.)

The Jury Plans provide that the Clerk of the Court will manage the jury selection process under judicial supervision, that persons in county voter registration lists who are qualified will be eligible to be selected for service under a computerized random selection process, and that the Clerk

will contract with a computer services provider to operate a program to carry out the Plan.

The Jury Plans state that, in every odd-numbered year, master jury wheels for each division are emptied and refilled with a number of persons' names randomly selected from the voter registration list of each county within each jury division. The Plans further provide that the numbers must be such to ensure that each county in the jury division is substantially proportionately represented in each master jury wheel.

Under the current system, in order to form a qualified jury wheel, one-half of the names in each master jury wheel are randomly drawn and the Clerk mails to each of these persons a juror qualification questionnaire prescribed by the Administrative Office of the United States Courts. Upon request, the Clerk must excuse persons who: (1) are over 70 years of age; (2) have served as a grand or petit juror in any federal court within the last two years; (3) have a qualifying undue hardship or extreme inconvenience; or (4) are volunteer safety personnel.

After reviewing the completed juror qualification questionnaires, the Clerk determines which persons have not been disqualified, exempted or excused. These persons are included in the qualified jury wheel. The qualified jury wheel is the source of persons who are randomly drawn for petit and grand jury panels.

The 2003 and the 2005 Jury Plans differ in that the 2003 Plan called for the formation of the master jury wheels during October of every odd-numbered year, while the 2005 Jury Plan called for their formation by March of every odd-numbered year. The primary differences between the 2005 and 2006 Jury Plans relate to how the state is divided for jury divisions and how many people are drawn to fill the master jury wheels.

The 2005 Jury Plan provided that the three petit jury divisions were (1) the Albuquerque/Santa Fe Division, (2) the Las Cruces Division, and (3) the Roswell Division; and the

two grand jury divisions were (1) the Northern Division (composed of the counties in the Albuquerque/Santa Fe petit jury division) and (2) the Southern Division (composed of the counties in the Las Cruces petit jury division and in the Roswell petit jury division).

Under the 2005 Jury Plan, the Albuquerque/Santa Fe Division included Bernalillo, Cibola, Colfax, Harding, Los Alamos, McKinley, Mora, Quay, Rio Arriba, San Juan, San Miguel, Sandoval, Santa Fe, Socorro, Taos, Torrance, Union and Valencia Counties; the Las Cruces Division included Catron, Doña Ana, Grant, Hidalgo, Luna, Otero and Sierra Counties; and the Roswell Division included Chaves, Curry, DeBaca, Eddy, Guadalupe, Lea, Lincoln, and Roosevelt Counties.

The 2005 Jury Plan provided that the numbers of persons to be placed initially in the Master Jury Wheel were at least 1000 for Roswell, at least 2000 for Las Cruces, and at least 3000 for Albuquerque/Santa Fe.

The 2006 Jury Plan provides that the three petit jury divisions are (1) the Northern Division, (2) the Central Division, and (3) the Southern Division; and the two grand jury divisions are (1) the Northern/Central Division (composed of the counties in the Northern petit jury division and in the Central petit jury division) and (2) the Southern Division (composed of the counties in the Southern petit jury division).

Under the 2006 Jury Plan, the Northern Division includes Colfax, Curry, DeBaca, Guadalupe, Harding, Los Alamos, Mora, Quay, Rio Arriba, Roosevelt, San Miguel, Santa Fe, Taos, and Union Counties; the Central Division includes Bernalillo, Cibola, McKinley, Sandoval, San Juan, Socorro, Torrance, and Valencia Counties; and the Southern Division includes Catron, Chaves, Doña Ana, Eddy, Grant, Hidalgo, Lea, Luna, Lincoln, Otero, and Sierra Counties.

The 2006 Jury Plan provides that the numbers of persons to be placed initially in the Master Jury Wheel shall be at least 1000 for all three petit jury divisions.

Additional details concerning the current jury selection system are contained in the affidavit of Eduardo Contreras, Jury Administrator for the District of New Mexico, submitted by the Government, and attached hereto, as Exhibit 1.

After January 2009, the Clerk's Office plans to implement a new system whereby it will qualify jurors approximately every two months, at the same time they are summonsed. Under the new system, a different qualified jury wheel will arise every two months.

### III.   Discussion.

#### A.   Overview of the Law.

The Sixth Amendment guarantees criminal defendants the right to a jury pool consisting of a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *United States v. Gault*, 141 F.3d 1399, 1402 (10th Cir. 1998). This does not guarantee that a jury will be "of any particular composition" and the jury actually chosen does not have to "mirror the community." *Taylor*, 419 U.S. at 538. Instead, the Sixth Amendment requires only that the pools of names "from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*

Writing for the majority in *Lockhart v. McCree*, 476 U.S. 162, 174 (1986), Chief Justice Rehnquist emphasized "[t]he essence of a 'fair-cross-section' claim is the systematic exclusion of 'a 'distinctive' group in the community.' " *Id.*, 476 U.S. at 174 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979).). Therein, Chief Justice Rehnquist reviewed purposes of the fair-cross-section requirement as:

> (1) "guard[ing] against the exercise of arbitrary power" and ensuring that the "commonsense judgment of the community" will act as "a hedge against the overzealous or mistaken prosecutor," (2) preserving "public confidence in the fairness of the criminal justice system," and (3) implementing our belief that "sharing in the administration of justice is a phase of civic responsibility."

*Lockhart*, 476 U.S. at 174 (quoting *Taylor*, 419 U.S. at 530-531).

In cases where problems have been found with the representativeness of the jury selection process, "the exclusion [of certain groups] raised at least the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community." *Lockhart*, 476 U.S. at 175.

In order to establish a prima facie violation of the Sixth Amendment fair-cross-section requirement,[1] a defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process. *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (citing *Duren*, 439 U.S. at 364); *United States v. Green*, 435 F.3d 1265, 1271 (10th Cir. 2006) (same). A defendant need not belong to one of the distinctive groups to have standing to raise a fair-cross-section challenge. *Taylor*, 419 U.S. at 526.

In order to establish a Fifth Amendment equal protection violation, a defendant must establish a "substantially similar showing, that the district's system resulted in substantial under-representation of a distinct group over a substantial period of time." *Orange*, 447 F.3d at 797 (citing *Castaneda v. Partida*, 430 U.S. 482, 494 (1977), and *Gault*, 141 F.3d at 1402). The defendant must show that the procedure employed resulted in substantial under-representation of his race or the

---

[1] Claims of violation of the Jury Selection and Service Act, 28 U.S.C. §§ 1861-1869, are evaluated under the Sixth Amendment standard. *United States v. Orange*, 447 F.3d 792, 797 n.6 (10th Cir. 2006) (citing *United States v. Shinault*, 147 F.3d 1266, 1271 (10th Cir. 1998)); *United States v. Haworth*, 948 F.Supp. 981, 987 (D.N.M. 1996) (citing *United States v. Test*, 550 F.2d 577, 588 (10th Cir. 1976)) .

identifiable group *to which he belongs*. *Castaneda*, 430 U.S. at 494 (emphasis added). Having presented no evidence that they are Hispanic, Defendants lack standing to assert a claim that Hispanics are under-represented in violation of the Fifth Amendment's equal protection clause. However, the Court will assume *arguendo* that Defendants have standing for their Fifth Amendment claims.

In *Castaneda*, the Court discussed the elements of a prima facie showing under the Fifth Amendment, as follows:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of under-representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. Once the defendant has shown substantial under-representation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*Castaneda*, 430 U.S. at 494-95 (citations omitted).

"While equal protection and fair-cross-section cases are not entirely analogous, as noted in footnote 26 in the *Duren* decision, 439 U.S. at 368, both violations require a showing of a distinctive group and a substantial under-representation of that group in jury venires before a prima facie case is established and the burden of proof shifts." *United States v. Yazzie*, 660 F.2d 422, 426 (10th Cir. 1981) (Brown, Wesley E., D. J., sitting by designation).

**B.     Application of the Law.**

      **1.     Whether Hispanics, men, and young adults ages 18 to 34 qualify as legally distinctive or cognizable groups within the community.**

Defendants assert that Hispanics, men, and young adults aged 18-34 comprise legally

7

distinctive groups within the community. Whether a legally distinctive group exists within a community is a question of fact. *United States v. Test*, 550 F.2d 577, 585 n.7 (10th Cir. 1976).

Groups found to have common interests such that they are considered a distinct group include women, Asians, Blacks, Hispanics and Native Americans.[2] *See Duren*, 439 U.S. at 364 (recognizing women as a distinctive group); *United States v. Shinault*, 147 F.3d 1266, 1272 (10th Cir. 1998) (recognizing Asians, Blacks, and Hispanics as distinctive groups); *United States v. Yazzie*, 660 F.2d 422, 426 (10th Cir. 1981) (recognizing Native Americans as a distinctive group). Religious faith has been held to suffice. *See United States v. Gelb*, 881 F.2d 1155, 1161 (2d Cir.1989) (holding Jews comprise a cognizable group).

In contrast, groups such as "rural people who have a driver's license and are not registered to vote", Native Americans living on a reservation, and college students are not considered distinctive groups. *Green*, 435 F.3d 1265 at 1271 (rejecting "rural people who have a driver's license and are not registered to vote" as a distinctive group); *United States v. Raszkiewicz*, 169 F.3d 459, 463 (7th Cir. 1999) (rejecting Native Americans living on a reservation as a distinct group); *United States v. Fletcher*, 965 F.2d 781, 782 (9th Cir. 1992) (rejecting college students as a cognizable group).

The Tenth Circuit has held:

> To establish cognizability, it is necessary to prove the following: (1) the presence of some quality or attribute which 'defines and limits' the group; (2) a cohesiveness of 'attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a 'community of interest' which may not be represented by

---

[2] The Supreme Court has categorized blacks and Hispanics as groups who, along with women, have been the subject of prior "jury-representativeness cases." *Lockhart*, 476 U.S. at 175. Although the cognizability of some groups was premised on Fourteenth Amendment equal protection grounds, *see Peters v. Kiff*, 407 U.S. 493 (1972); *Castaneda*, 430 U.S. at 495 (Hispanics), the Supreme Court has suggested that exclusion of these groups might also constitute a violation of the Sixth Amendment fair-cross-section requirement. *See Lockhart*, 476 U.S. at 175. Thus, Hispanics may constitute a per se "distinctive group" for purposes of the Sixth Amendment.

other segments of society.

*Test*, 550 F.2d at 591 (citation omitted).

More recently, the Tenth Circuit observed:

> Our sister circuits have adopted a three-part test for determining whether a group is "distinctive." Factors considered include whether: (1) the group is defined by a limiting quality (i.e. the group has a definite composition such as race or sex); (2) a common thread or basic similarity in attitude, idea, or experience runs through the group; and (3) a community of interests exists among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process.

*United States v. Green*, 435 F.3d 1265, 1271 (10th Cir. 2006).

Hispanics clearly qualify as a distinct group for the purpose of a jury composition challenge. *See Castaneda v. Partida*, 430 U.S. at 495; *Shinault*, 147 F.3d at 1272 (recognizing Asians, Blacks, and Hispanics as distinct groups). Indeed, the Government acknowledges this point.

While women have been recognized as a distinct group, Defendants have cited no authority that recognizes men as a distinct or cognizable group within the community for the purpose of a jury composition challenge. At the evidentiary hearings, Defendants attempted to show that men constitute a distinctive or cognizable group through the testimony of their expert witnesses. Defense expert Brian Sanderoff testified in terms of gross generalities that men gather for the purpose of social interaction. On cross-examination, Mr. Sanderoff admitted that men have not been historically disadvantaged by the structure of society.

By contrast, James D. Williams, M.A., Ph.D., Professor Emeritus, Sociology, New Mexico State University, testified on behalf of the Government that the fact that women have developed a gender-based identity to rally against the power of men in society does not establish that men are a cohesive group. Dr. Williams testified that men do not tend to form groups for the purpose of discussing or fostering the issues of men. The testimony of Dr. Williams was far more reliable and

9

entitled to more weight than the testimony of Mr. Sanderoff on this point. Defendants failed to establish that men are a legally distinctive or cognizable group.

Defendants' evidence in support of their assertion that young adults aged 18-34 comprise a legally distinctive group is similarly unavailing. Notably, the Supreme Court has yet to recognize a group as distinctive or cognizable based solely upon the age of the members of the group. Furthermore, Defendants have failed to identify any federal appellate court that has recognized distinctiveness or cognizability based solely upon age. In fact, Tenth Circuit precedent, as well as the weight of authority,[3] point to the opposite conclusion.

In 1976, the Tenth Circuit rejected "persons aged 21-39 years" as a distinctive group. *Test*, 550 F.2d at 591. Therein, the court noted:

> The mere fact of similarity in age cannot, by itself, be sufficient to define a cognizable group. If it were, any jury selection system could be successfully attacked by a strategic drawing of age group lines . . . . Among any age group there will be vast variations in attitudes, viewpoints, and experiences. The fact that two persons are the same age does not necessarily give them a community of interest. And although we hear much talk of the "generation gap," it is impossible to define that gap with any precision, as the defendant has tried to do.

*Test*, 550 F.2d at 593.

In *United States v. Cesar Gonzales, et al.*, CR 95-0538 MV (Feb. 12, 1998), Chief Judge Vazquez rejected a defense challenge to jury selection based on alleged under-representation of a group of persons born after 1964. Chief Judge Vazquez found that the defendant in that case had

---

[3] *See, e.g., Brewer v. Nix*, 963 F.2d 1111, 1113 (8th Cir. 1992) (rejecting those over age 65 years as distinctive group); *Silagy v. Peters*, 905 F.2d 986, 1009-11 (7th Cir. 1990) (rejecting age 70 and over as distinctive group); *see also Wysinger v. Davis*, 886 F.2d 295, 296 (11th Cir. 1989) (rejecting age alone as determinative of distinctiveness for Sixth Amendment purposes); *Ford v. Seabold*, 841 F.2d 677, 682 (6th Cir. 1988) (rejecting "young adults" as distinctive group); *Barber v. Ponte*, 772 F.2d 982, 998-99 (1st Cir. 1985) (en banc) (rejecting 18-34 years as distinctive group); *United States v. Diggs*, 522 F.2d 1310, 1317 (D.C. Cir. 1975) (rejecting 21-30 years as distinctive group); *United States v. Kuhn*, 441 F.2d 179, 181 (5th Cir. 1971) (rejecting 21-23 years as distinctive group).

not satisfied the first prong of the applicable tests under either the Fifth or Sixth Amendments. *Gonzales* at 14. "[Y]oung adults . . . do not constitute a distinctive group or a recognizable, distinct class singled out for different treatment under the laws." *Id*.

In this case, Defendants have also failed to establish that young adults aged 18-34 comprise a legally distinctive or cognizable group within the community. Mr. Sanderoff testified that the use of technology, the drinking age, and political trends define young adults ages 18-34 as a cohesive group. Defense expert Dr. David Keys, M.A., Ph.D., Assistant Professor, Criminal Justice, New Mexico State University, testified that the life goals, life pattern motivation, attitudes toward taking risk, intellectual patterning, intellectual modality, diurnal tendency, and cognitive basis for young persons ages 18 to 35[4] differs from that of persons over 45. (*See* Def. Ex. P.)

Conversely, Dr. Williams testified that the category of "young adults ages 18-34" represents a fairly artificial definition and differences abound within that category. The testimony of Dr. Williams is far more reliable and entitled to more weight than the testimony of the defense experts. The fact that segments of this group may share identifying issues does not equate to the sort of broad-based, issues-oriented inquiry contemplated by the case law. At best, Defendants have put forth trends which might exist among this age group. Defendants have not shown internal cohesiveness that members of the community outside of the group could not share the views of the group. In light of the case law, and Defendant's lackluster evidentiary showing, I conclude that young adults ages 18 to 34 do not comprise a legally distinctive or cognizable group within the community.

---

[4] Dr. Keys testified that there was no material difference between a group defined as young adults ages 18 to 34 and a group defined as persons 18 to 35. In that Defendants defined their group as "young adults ages 18 to 34," that term will be employed herein.

### 2. Whether the representation of Hispanics is fair and reasonable in relation to the number of persons in this group in the community.

#### a. Overview.

When analyzing jury composition challenges, courts generally rely on two methods of comparison: absolute disparity and comparative disparity. *Gault*, 141 F.3d at 1402 (citing *Yazzie*, 660 F.2d at 426.) Census data and the responses to the juror qualification questionnaires are used to compute these statistics. *Gault*, 141 F.3d at 1402. Absolute disparity is determined by subtracting the percentage of a group in the jury wheel from the percentage of that same group in the general population. *Id.* Comparative disparity is determined by dividing the absolute disparity of a group by the percentage of that group in the general population. *Id.* In conducting its analysis, the Court must look to the relevant qualified juror wheels and the most recent census data. *Gault*, 141 F.3d at 1402 (citing *Yazzie*, 660 F.2d at 427).

#### b. The raw 2000 census data provides the proper basis for comparison.

Defendants assert that the Court should follow Mr. Sanderoff's assumption concerning census bureau estimates of increases in population. (Defs. Ex. D, ¶ 17.) Mr. Sanderoff assumed that the state's adult Hispanic population increased by almost 2% since the 2000 census. (*Id.*) When faced with a similar assumption from Mr. Sanderoff, Judge Parker determined:

> I conclude that, in the absence of more precise information about census undercounting or the percentage of racial or ethnic groups not eligible for jury service, the most reasonable, prudent approach is to use the raw census data, which gives the most reliable statistics in the record. See *Duren v. Missouri*, 439 U.S. 357, 365 (1979) (absent evidence in the record that census figures "significantly distorted" the relevant percentage, that data is adequate for analyzing fair cross section challenge).

*Gault*, 973 F.Supp. at 1313.

Judge Parker's approach comports with Tenth Circuit case law. The raw data from the 2000

census will be applied herein.

### c. The relevant qualified jury wheels provide the correct data for comparison.

The Tenth Circuit has clearly held that the relevant qualified jury wheels and most recent census data provide the basis for analyzing jury composition challenges. *See Gault,* 141 F.3d at 1402 ("When analyzing jury composition challenges, the court must look to the relevant Qualified Juror Wheels") (citing *Yazzie*, 660 F.2d at 427). *See also Haworth*, 948 F.Supp. at 983 (stating that disparities on other wheels are irrelevant to an inquiry about a specific wheel). Mr. Sanderoff relies on analysis of data from individual grand jury panels in order to reach his conclusions. (Sanderoff Affidavit, Ex. A, Defs.' Ex. D.) This approach is contrary to established Tenth Circuit law. As a consequence, Defendants' reliance on data from grand jury panels is misplaced.

### d. Prospective jurors who answered "yes" to Question 10(b) on the jury qualification questionnaire should be counted as Hispanic.

Question 10 on the jury qualification questionnaire provides:

10. ----------------------------------------RACE/ETHNICITY--------------------------------
    a.  To assist in ensuring that all people are represented on juries, please fill in completely one or more circles which describe you. (See note on reverse side.) Nothing disclosed will affect your selection for jury service.
    "  Black/African American    "  Asian      "  American Indian/Alaska Native
    "  White        "  Native Hawaiian/Pacific Islander
    "  Other (specify) _____
    b.  Are you Hispanic or Latino?  Yes  "   No  "

(Defs. Ex. B.)

The note on the reverse side of the form states:

> Question 10 - Race/Ethnicity.  Federal law requires you as a prospective juror to indicate your race.  This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service.  By answering this question you help the federal court check and observe the juror selection process so that discrimination cannot occur.  In this way, the federal court can fulfill the policy of the United States, which is to provide jurors who are randomly selected from a fair cross section of the community.

(Defs. Ex. B.)

Defendants' expert, Mr. Sanderoff, assumed that many respondents may have considered this to be one question and thought that, by answering Question 10(a), answering Question 10(b) was unnecessary. (Defs. Ex. D, ¶19.) Defense counsel explains, "[a]s detailed in Appendix A to Exhibit C, Mr. Sanderoff concludes that people who did not mark a race category were nearly universally Hispanic, with 94% of them responding "Yes" to the Hispanic origin question. Additionally, among those who filled in "Other" in the race category, almost 80% were Hispanic. At the same time, respondents who responded to the race question were much more likely to not answer the Hispanic question or to answer "No" to it." (Doc. 278 at 11.)

By contrast, in analyzing an earlier version of the juror questionnaire form, Judge Hansen, Judge Parker, and Chief Judge Vazquez excluded the unidentified jurors from the total number in arriving at their respective percentages. *See United States v. Haworth*, 948 F.Supp. 981, 984 (D.N.M. 1996) (Judge C. Leroy Hansen); *United States v. Gault*, 973 F.Supp. 1309, 1312 (D.N.M. 1997) (Judge James A. Parker); *United States v. Cesar Gonzales, et al.*, CR 95-0538 MV (Feb. 12, 1998) (Chief Judge Martha Vazquez).

On the earlier version of the juror questionnaire, Question 11(A) asked prospective jurors to "fill in the circle completely which best describes your race." *Gault*, 973 F.Supp. 1320. Question 11(B) asked "Are you Hispanic?" *Id.* "Importantly, 68 of the 1025 persons included in the 1993 Qualified Juror Wheel and 93 of the 1186 in the 1995 Qualified Juror Wheel did not (1) identify their race in answer to Question No. 11(A), and (2) either did not answer, or answered "no," to Question No. 11(B), regarding whether they are Hispanic." *Gault*, 973 F.Supp. at 1312. In arriving at the absolute and comparative percentages, Judge Parker excluded these unidentified jurors from the total number in each Qualified Juror Wheel. *Id.*

14

Judge Parker explained:

> I excluded the unidentified jurors for several reasons. First, Alok Bohara, the only expert in statistics who testified at the November *Gonzales* hearing, stated that it is the standard practice of statisticians to exclude the missing or unidentified category in cases like this in which the focus is on a variable such as race and/or ethnicity. Second, to include the unidentified jurors in the totals would produce inaccurate results because it would assume that, for a particular racial or ethnic category, none of the unidentified jurors fell within that category. There is no reliable way of determining, from the evidence in this case, the racial and ethnic composition of people who did not identify themselves as being members of specific racial groups and/or Hispanic. Intuitively, it makes more sense to assume that those who did not identify themselves are likely to be in racial or ethnic percentages roughly the same as those who did.

*Gault*, 973 F.Supp. at 1312-13.

Similar approaches were taken by Judge Hansen and Chief Judge Vazquez in *Haworth*, 948 F.Supp. at 984, and *Gonzales*, slip. op. at 6-8. In this case, the Government's expert, Ronald M. Schrader, Ph.D., acknowledged that a common practice in such cases is to discard the "missing values" and divide the number of positive answers by the number of individuals who answered the question. Exclusion of the unidentified jurors presents a more reasoned approach. In order to avoid artificial inflation of the number of Hispanics, the Court herein will count as Hispanic only those who affirmatively identified themselves as Hispanic.

### e. The relevant measurements are absolute and comparative disparity.

In order to determine whether the representation of a distinct or cognizable group is fair and reasonable in relation to the number of persons in these groups in the community, the Tenth Circuit has consistently relied upon the two measurements, absolute and comparative disparity, described above. *Orange*, 447 F.3d at 798; *Shinault*, 147 F.3d at 1272; *Gault*, 141 F.3d at 1401-02; *Yazzie*, 660 F.2d at 426.

While absolute disparity measures the difference between the percentage of a group in the

general population and its percentage in the qualified wheel, comparative disparity measures the decreased likelihood that members of a distinct and under-represented group will be called for a jury. *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000); *Shinault*, 147 F.3d at 1272. In order to warrant judicial intervention, the disparities must be "gross" or "marked." *Yazzie*, 660 F.2d at 428; *Test*, 550 F.2d at 590.

### f. Defendants have failed to establish under-representation of Hispanics.

Defendants were indicted by a Las Cruces grand jury in November 2006. That grand jury was selected from what was the Southern grand jury division under the 2003 Jury Plan and the 2005 Qualified Jury Wheels for the Las Cruces and the Roswell petit jury divisions. The representation of Hispanics in the 2005 Qualified Jury Wheel for the Southern Grand Jury Division must be fair and reasonable in relation to the 2000 census data showing the number of Hispanics in the counties comprising those divisions. *See Yazzie*, 660 F.2d at 427.

Table 1 summarizes the relevant data.[5]

| Table 1 | Total Jurors in Wheel | Identified Hispanics in Wheel | Percent Hispanic in Wheel | Percent Hispanic in 2000 Census | Absolute Disparity | Comparative Disparity |
|---|---|---|---|---|---|---|
| 2005 Qualified Wheel for the Southern Grand Jury Division | 5614 | 1790[6] | 32% | 37% | 5% | 14% |

---

[5] The whole numbers were obtained from the Absolute and Comparative Disparity Analysis for Hispanics in Relevant Qualified Jury Wheels prepared by Plaintiff's expert witness, Ronald M. Schrader, Ph.D., Professor Emeritus Mathematics and Statistics, University of New Mexico, Biostatistician, Clinical Research Center, University of New Mexico, and Biostatistician, Albuquerque VAMC, Biomedical Research Institute of New Mexico. (Pl. Exs. 1, 2, and 4.)

[6] The Clerk's Office has this number as 1791.

The Tenth Circuit has upheld absolute disparities in the 4% to 7% range. *See e.g. Gault*, 141 F.3d at 1402-03 (7% absolute disparity); *Yazzie*, 660 F.2d at 427 (4.29% absolute disparity); *Test*, 550 F.2d at 588-89 (4% absolute disparity).  Here, the absolute disparity of 5% for the 2005 Qualified Wheel for the Southern Grand Jury Division falls within the judicially-endorsed range.

Similarly, the Tenth Circuit has approved comparative disparities in the 40% to 59% range. *Orange*, 447 F.3d at 799 (comparative disparities of 35.41%, 36.82%, 54.41%, and 54.97%); *Chanthadara*, 230 F.3d at 1257 (comparative disparities of 40.89% and 58.39% for groups comprising 7.9% and 2.74% of the population, respectively); *Shinault*, 147 F.3d at 1273 (59.84%, 50.09% and 48.63% with group populations comprising 1.27%, 5.11% and 2.92% of the total community, respectively).  In this case, a comparative disparity of 14% for a group comprising 37% of the total community falls well under the comparative disparities that have withstood judicial scrutiny by the Tenth Circuit.  Defendants have failed to establish that Hispanics were under-represented in the qualified wheel from which their grand jury was selected.

Defendants will be tried before petit juries from the Southern petit jury division. It is anticipated that Defendants will stand trial in 2009.  After January 2009, the Clerk's Office plans to implement a new system whereby it will qualify jurors approximately every two months, at the same time they are summonsed.  Under the new system, a different qualified jury wheel will arise every two months.  Defendants may renew their motion with respect to their petit juries when the information concerning the relevant qualified juror wheels becomes available.

**3.    Even if Defendants could establish under-representation, they have failed to show that any under-representation would be due to the systematic exclusion of Hispanics in the jury-selection process.**

In support of the third element, Defendants rely on the fact that "concerns have been repeatedly raised that there is a systematic under-representation of cognizable groups such as

Hispanics and Native Americans in the jury wheel and pools used to select jurors for federal cases in the District of New Mexico." (Doc. 307 at 21.) Defendants then cite *Yazzie*, *Haworth* and *Gault* as indicative of historical discrimination. In each of these prior decisions, judges of this District, as well as the Tenth Circuit Court of Appeals, have upheld the jury selection process in this District.

Defendants argue that Hispanics have been systematically excluded because they have historically registered to vote in lesser numbers than non-Hispanics. This argument was squarely rejected by the Tenth Circuit in *Orange*. Therein, the Tenth Circuit stated:

> Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by Duren. See Test, 550 F.2d at 586-87; see also Barber v. Ponte, 772 F.2d 982, 997 (1st Cir.1985) (en banc); United States v. Cecil, 836 F.2d 1431, 1446-47 (4th Cir.1988). The circuits are "in complete agreement that neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population." Test, 550 F.2d at 587 n. 8 (collecting cases) (internal quotations and ellipses omitted). In addition, voter registration lists are the presumptive statutory source for potential jurors. 28 U.S.C § 1863(b).

*Orange*, 447 F.3d at 800.

The fact that Hispanics may have, over time, registered to vote in proportionally lesser numbers than other groups and, on that basis, that the numbers are skewed does not support the notion that Hispanics are systematically excluded in the jury-selection process.

Defendants advocate for supplementation of the voter registration lists with drivers license and identification card lists. The Tenth Circuit rejected such an approach when the existing measures, absolute and comparative disparity, fail to establish a prima facie case under existing law. *Orange*, 447 F.3d at 799. "A court's consideration of reasonable measures that may reduce disparity is primarily remedial and really does not address whether the disparity is a result of systematic exclusion of a particular group." *Id*. Defendants failed to present any evidence indicating the

18

existence of any systematic exclusion of Hispanics in the jury-selection process in the District of New Mexico.

**V.      Conclusion.**

Defendants' arguments lack legal and factual support. Young adults, ages 18 to 34, and men do not qualify as legally distinct or cognizable groups for purposes of challenging the jury-selection process. Defendants have established neither under-representation nor a systematic exclusion of Hispanics in the jury-selection process.

Defendants may renew their motion with respect to their petit juries when the information concerning the relevant qualified juror wheels becomes available.

Question 10(a) and Question 10(b) on the jury qualification questionnaire should be redrafted to minimize the potential for needless confusion. These questions aim to "fulfill the policy of the United States, which is to provide jurors who are randomly selected from a fair cross section of the community." (Defs. Ex. B.) Between 20% to 24% of prospective jurors left Question 10(b) blank. (Pl. Ex. 2.) If, routinely, significant numbers of respondents fail to answer a question intended for all, a reformulation of the questionnaire ought to be given serious consideration.

**WHEREFORE,**

**IT IS ORDERED** that Defendants' Motion to Dismiss the Indictment Because the Grand Jury Selected in the Case Failed to Represent a Fair Cross-Section of the Community, as Will the Future Petit Jury (Doc. 307), filed on June 19, 2008, is **DENIED**.

                                                                                    _____
                                                                                    **ROBERT C. BRACK**
                                                                                    **UNITED STATES DISTRICT JUDGE**